## AMERICAN BANK & TRUST CO. v. BENTON et al.

## FIRST NAT. BANK OF OPP v. SAME.

### 4 Div. 781.

Supreme Court of Alabama.

May 16, 1935.

Rehearing Denied June 20, 1935.

804

A. Whaley, of Andalusia, for appellant American Bank & Trust Co.

Mulkey & Mulkey, of Geneva, for appellant, First Nat. Bank of Opp.

E. O. Baldwin and C. B. Fuller, both of Andalusia, for appellees.

BOULDIN, Justice.

Appellant, American Bank & Trust Company, a state banking corporation, doing a banking business at Opp, Ala., filed the bill as a junior mortgagee of real estate. First National Bank of Opp was brought in because a holder of the mortgage security as collateral. To borrow the apt statement of counsel for the latter bank, "The complainant sought by its bill, as finally amended, to redeem the lands involved from the owners of the prior mortgage to the Federal Land Bank, and as a necessary incident thereto, an accounting of the balance due, with reference to the collection and application of the insurance money," meaning insurance collected for a fire loss on the mortgaged premises.

The mortgage to complainant bank was executed by George C. Benton, also known in the record as Chester Benton. The original mortgage was given March 17, 1928, and renewed in February, 1929.

Prior to March 17, 1928, the lands were owned by J. A. Benton, the uncle of Chester Benton, subject to a prior mortgage executed by a predecessor in title to Federal Land Bank of New Orleans.

On March 17, 1928, J. A. Benton, and Mittie Benton, his wife, executed to Chester Benton a deed to the property. In other words, this deed to Chester Benton and his mortgage to the bank were contemporaries.

The chief issue of fact concerns the validity vel non of the deed from J. A. Benton and wife to their nephew, Chester Benton, and, if invalid, the effect thereof on the mortgage to complainant.

The deed is assailed on the ground that the grantor, J. A. Benton, was of unsound mind; and on the ground of misrepresentation, fraud, and imposition in the procurement of the deed.

Much testimony is devoted to the question of unsoundness of mind of the grantor, J. A. Benton. It has been carefully considered. We do no more than outline its general tendencies, and announce our conclusion touching his mental condition as affecting both the questions of insanity and fraud.

J. A. Benton, while in possession of full vigor of mind and body, was a rather prudent, capable man in business affairs, accumulating a considerable estate. At the time of this transaction, he had passed his three score and ten years of age; his eyesight was seriously impaired; his memory, continuity of thought, business capacity showed signs of impairment. Much testimony goes to growing mental debility in the years following this transaction. Dates are often indefinite. Up to the date in question—March 17, 1928—he did continue to personally transact business. We are impressed respondents have not met the burden of showing he had become so mentally unsound as to be incapable of knowing the import of ordinary business transactions.

The presumption of sanity is not to be minimized. Much hardship and injustice may easily ensue where a man continues to go about his business affairs, and men deal with him in good faith. The stern rule in Alabama that contracts of insane persons are void should be applied with caution. It is often most difficult, even when many incidents of lapse of judgment or intelligent understanding are presented, to determine when the border line has been passed.

Mental infirmity, however, short of actual insanity, may often enter the picture in dealing with cases of fraud and imposition, wherein the party does not deal at arm's length.

We turn, therefore, to the study of this phase of the record before us.

We mention some incidental matters leading to the lawsuit:

J. A. Benton and Mittie, his wife, had long lived in or near Opp. Their only child, Mrs. C. E. Jackson, lived in Mobile.

Early in 1931, Mrs. Jackson, advised of the financial plight of her parents, took the lead in protecting the interests of the family.

On petition by Mittie Benton, an inquisition of lunacy was had, and J. A. Benton adjudged of unsound mind. R. S. Rainer was appointed as guardian of his estate. Thereupon a bill in equity was filed on behalf of J. A. Benton, by his guardian, to cancel the deed here in question. And in October, 1931, a decree was entered canceling said deed for fraud and unsoundness of mind and an entry of cancellation entered on the record of the deed.

■ The lunacy proceedings are not evidence of unsoundness of mind some four years before. It is not so insisted.

As to the cancellation decree, it appears American Bank & Trust Company was made a party to the bill, but, on its own motion, was stricken out. There is some argument that, nevertheless, said bank was an active party in seeking to defeat such bill, and that the decree should be held binding. It appears the cashier of the bank did approach J. A. Benton and procure an order from him purporting to direct a dismissal of the bill. Neither such proceeding, nor any other shown in evidence, warrants any finding that the bank actively participated in and caused to be litigated the merits of the bill as affecting the validity of its mortgage. The action noted shows a purpose to avoid any such issue.

In the spring following the decree of cancellation, Mrs. Jackson negotiated a purchase of the mortgage held by Federal Land Bank, caused the same to be assigned to her and her mother, and proceeded to advertise the property for a foreclosure sale thereunder.

This bill followed for accounting and redemption by the junior mortgagee, and, meantime, to enjoin the foreclosure sale.

The issue of fraud in the procurement of the deed, want of consideration therefor, knowledge of the mortgagee bank, the consideration for the mortgage an existing indebtedness of the mortgagor to the mortgagee, are presented in the answer of the guardian for J. A. Benton, as well as those of Mrs. Benton and Mrs. Jackson, holders of the prior mortgage, from which complainant asserts a right to redeem.

The eyewitnesses to the execution of the deed are only two, one on each side.

The witness for complainant is Casey Dalton, a young man, then teller and bookkeeper of complainant bank, who went with Chester Benton to the home of J. A. Benton, where the deed theretofore prepared was presented to J. A. Benton and wife, signed by them, and their acknowledgments certified by Mr. Dalton, as notary public.

The witness for respondents is Mrs. Benton. There is some difference in their testimony touching the reading of the deed to J. A. Benton before signing, but as to the issue of fraud there is little of actual conflict and much of circumstantial sort tending to support Mrs. Benton.

The evidence is quite clear that Chester Benton, a young nephew, then quite active in a business of his own, was taken into the home of the old people; they specially furnished a room for him; they became very fond of him. As his uncle was growing old, Chester interested himself in the uncle's business. He became in much the agent or representative of his uncle, drawing checks on the latter's bank account. In a word, confidential relations as known in the law became strongly established. Chester's business methods lacked the elements of success. He became a bankrupt. Meantime, his handling of his uncle's affairs was well known in banking circles.

Mr. Mizell, active head of the First National Bank of Opp, where J. A. Benton's banking business had been done until Chester caused it to be transferred to American Bank & Trust Company, testifies with commendable frankness, despite his personal interest to the contrary, that if J. A. Benton had asked his advice during that period, witness would have told him Chester was going to ruin him financially.

The recited consideration of $2,000 in the deed from J. A. Benton and wife to Chester Benton was not paid nor intended to be paid. As between them and Chester, it was a mere gift inter vivos, the grantee, the dominant party, under relations of confidence. That he was active in the preparation and execution of the instrument is not to be questioned.

The case bears much analogy to that of Waddell, Adm'r v. Lanier et al., 62 Ala. 347. For a full discussion of the principles involved, and the presumptions to be indulged, we need do no more than refer to that case.

Mrs. Benton testifies it was represented that the deed was desired to further the sale of some lots. There is no reason to discredit her statement in that regard, and indulge in a general presumption of fraud and imposition in some other manner.

The mortgage from Chester Benton to the bank bears the same date as the deed in question; both are parts of one transaction; both parties were active therein. The purpose was to secure Chester's debt to the bank with his uncle's property. There is no good reason to hold the bank management was not fully advised of the confidential relations between Chester and his uncle. It is not essential that the bank should have actively and purposely assisted in perpetrating a fraud in these circumstances. Engaging with Chester in a joint enterprise of this sort, the fruits to inure to the bank, the acts of Chester must be treated as the acts of the bank. It cannot claim the fruits without incurring the burden of infirmity in the one transaction.

Probably it is due Chester to at least note that his answer disclaims any ultimate purpose to defraud his uncle. He claims it was a plan to put his indebtedness at the bank in better shape for the coming of the bank examiner, with intent to ultimately return or destroy the deed and mortgage.

We need not study the probative force of the circumstances tending to support such theory.

It is sufficient to say, on the ground above indicated, the bank does not stand in the position of a bona fide purchaser without notice from a fraudulent grantee.

We need not consider other questions as to the nature of the consideration for complainant's mortgage.

This holding applies also to appellant First National Bank of Opp, who claims an interest in the mortgage security. It appears this bank acquired the note and mortgage as collateral after same was dishonored—past due and unpaid. It does not seem to be questioned that the equity of this bank turns on that of American Bank & Trust Company.

The decree of the trial court was in harmony with these views, and will be affirmed.

However, there was considerable evidence presented to be used in an accounting, if complainant's mortgage be upheld, tending to show outlays on the part of the complainant after obtaining its mortgage, such as taxes, local assessment, insurance premiums, and installment payments on the Federal Land Bank mortgage, all inuring to the protection and enhancement of the equity of redemption in J. A. Benton. Against these charges, there was evidence of rents turned into the bank, etc.

Without here considering any equity by way of subrogation or otherwise, notwithstanding the invalidity of complainant's mortgage, we deem it proper to so modify the decree that same shall be without prejudice to an accounting concerning such outlays by filing a new bill, if complainant shall be so advised.

Modified and affirmed.

GARDNER, FOSTER, and KNIGHT, JJ., concur.